**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**RAZORBACKS,**
**A California General Partnership**                                    **PLAINTIFF**

**v.**                          **Case No. 4:12-cv-00158-KGB**

**GRAPHIC PACKAGING**
**INTERNATIONAL, INC.**                                           **DEFENDANT**

**<u>ORDER</u>**

Razorbacks brings this action against Graphic Packaging International, Inc. ("GPI"), alleging breach of contract, waste and deliberate destruction, conversion, and unjust enrichment (Dkt. No. 8). Razorbacks also requests attorney's fees and punitive damages. On May 30, 2013, GPI and Razorbacks filed cross-motions for partial summary judgment (Dkt. Nos. 23, 27). The parties also filed responses and replies (Dkt. Nos. 32, 35, 39, 41). GPI also filed two supplemental briefs in support of its motion for partial summary judgment (Dkt. Nos. 62, 72), to which Razorbacks responded (Dkt. Nos. 68, 76).

For the following reasons, the Court grants in part and denies in part GPI's motion for partial summary judgment. Summary judgment is granted to the extent that Razorbacks contends that GPI improperly took the overhead cranes, fire extinguishers, bug netting, gas heaters, air conditioners, security system, fire department access gate, and overhead doors from the building. GPI's motion for partial summary judgment is denied in all other respects.

Further, Razorbacks's motion for partial summary judgment is denied. The Court determines that GPI was obligated to maintain certain parts of the premises and deliver the entire premises in as good condition as at the beginning of the lease term.

## I.        Factual Background

On July 30, 1971, Great Plains Realty Company, Inc., (Razorbacks's predecessor in interest in regard to the lease) leased a warehouse building located at 1301 Redmond Road, Jacksonville, Arkansas, to Great Plains Bag Corporation (GPI's predecessor in interest in regard to the lease) (Dkt. No. 62-3).  On November 3, 1989, a new lease agreement was entered into by the then-landlord Mid-American Development Company (Razorbacks's predecessor in interest in regard to the lease) and then-tenant Stone Container Corporation (GPI's predecessor in interest in regard to the lease) (Dkt. No. 27-1).  In 2008, GPI became the tenant of the warehouse building as a result of a series of acquisitions and mergers (Dkt. No. 24, at 1).  Razorbacks purchased the property from Mid-American Development Company in August 2009 (*Id.*).  The parties agree that the 1989 lease agreement is applicable to Razorbacks and GPI (*Id.*).  At the expiration of the lease at the end of 2011, GPI vacated the facility.  This suit, based on the 1989 lease agreement, concerns the condition of the warehouse building at the time GPI turned the building over.

## II.        Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not

rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.    Analysis

Razorbacks's amended complaint alleges four substantive claims: (1) breach of contract; (2) waste and deliberate destruction; (3) conversion; and (4) unjust enrichment.  Each of the four claims are based on one of three theories:  (1) that GPI failed to maintain the premises; (2) that GPI improperly took equipment and fixtures out of the building; and (3) that, in taking out certain equipment and fixtures, GPI damaged the building.

GPI moves for summary judgment on all claims based on the first and second theories because Razorbacks allegedly "has no evidence of the condition the property was [in] at the beginning of the leasehold nor what items belonged to the owner," and the "evidence existing is that GPI turned the property over in the same, or better, condition than it was in 1989" (Dkt. No. 23, at 1).  GPI also moves for summary judgment on Razorbacks's claim for punitive damages. GPI acknowledges that there is a genuine issue of material fact regarding whether removal of certain equipment and fixtures damaged the building.

Razorbacks moves for summary judgment regarding GPI's maintenance obligations under the lease and requests that this Court define that obligation.  Even so, Razorbacks

acknowledges the existence of a genuine issue of material fact with respect to the extent of GPI's alleged breach of its maintenance obligation and the purported resulting damages.

### A.    Alleged Violations Of Local Rule 56.1 And Local Rule 7.2(b)

To begin, GPI argues that Razorbacks's motion for partial summary judgment should be denied because Razorbacks violated Local Rule 56.1, which provides that "[a]ny party moving for summary judgment . . . shall annex to the notice of motion a separate, short and concise statement of the material facts as to which it contends there is no genuine dispute to be tried."  In turn, Razorbacks argues that GPI failed to respond to its motion for partial summary judgment within 14 days, as required by Local Rule 7.2(b), and thus the Court should not consider GPI's late response.  The Court declines to grant GPI's motion for partial summary judgment based on Local Rule 56.1 and declines to strike GPI's response to Razorbacks's motion for partial summary judgment based on Local Rule 7.2(b).

### B.    The Theory That GPI Failed To Maintain The Premises

GPI moves for summary judgment as to Razorbacks's theory that GPI failed to maintain the premises.  The Court first must determine GPI's maintenance obligation under the lease. Then the Court will consider whether there is a genuine issue of material fact as to whether GPI failed to meet its maintenance obligation.

### 1.    GPI's Maintenance Obligation Under The Lease

"When a contract is unambiguous, its construction is a question of law."  *GeoVera Specialty Ins. Co. v. Graham Rogers, Inc.*, 636 F.3d 445, 449 (8th Cir. 2011) (quoting *Artman v. Hoy*, 257 S.W.3d 864, 869 (Ark. 2007)); *see Triple H Debris Removal, Inc. v. Companion Prop. & Cas. Ins. Co.*, 647 F.3d 780, 787 (8th Cir. 2011) ("Whether the contract language is ambiguous is a question of law for the court."  (citing *Nichols v. Farmers Ins. Co.*, 128 S.W.3d 1,

4 (Ark. Ct. App. 2003))).  "The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended." *Coleman v. Regions Bank*, 216 S.W.3d 569, 574 (Ark. 2005).  In construing a contract, courts "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning." *Id.*  The intention of the parties, however, is not gathered from particular words and phrases but from the whole context of the agreement.  *Id.*  If possible, "[d]ifferent clauses of a contract must be read together and the contract be construed so that all of its parts harmonize." *Fryer v. Boyett*, 978 S.W.2d 304, 306 (Ark. 1998).

GPI contends that, under the lease, it was obligated to return the premises in as good order, repair, and condition as the premises was in at the beginning of the lease.  Razorbacks argues that GPI was obligated to maintain the premises in "good condition," irrespective of the condition at the beginning of the lease.  The parties agree that the relevant clauses in the lease regarding GPI's maintenance obligation are paragraphs 15 and 24.

Paragraph 15 provides that:

Tenant shall maintain and keep in good repair and condition the roof, exterior walls, foundations and structural frame of the building and the complete exterior and interior of the leased premises, including all glass, and the parking lot and all landscaping on the leased premises.  It is understood and agreed that the Landlord shall have no obligation to make repairs or replacements during the term of the lease, and that the sole responsibility for maintaining the leased premises in good condition as to repairs and replacements is that of the Tenant.

(Dkt. No. 8-1, at 7).

Paragraph 24 provides in pertinent part that:

Tenant shall deliver up possession of the leased premises in as good order, repair and condition as the same are in at the beginning of the term of this lease, except as in this lease otherwise specifically provided and except for normal wear and tear.

(*Id.* at 9-10).

The Court determines that, under paragraph 15, GPI was obligated to *maintain* certain parts of the premises, including the roof, in as good condition as at the beginning of the lease term.  The plain language of the lease leads to this conclusion, *see Holt v. State*, 290 S.W.3d 21, 27 (Ark. Ct. App. 2008) (quoting Webster's II Dictionary to define "keep" as "to remain in a given state: stay" and "maintain" as "to keep an existing state"), *rev'd in part on other grounds*, 348 S.W.3d 562 (Ark. 2009); *Garrett v. Faubus*, 323 S.W.2d 877, 899 n.4 (Ark. 1959) (quoting Webster's Unabridged Dictionary to define "maintain" as "to hold or keep in any particular state or condition . . . to support . . . not to suffer to fail or decline . . . to bear the expense of . . . to carry on . . . to give support to . . ."), and other courts that have ruled on this issue have found the same, *see Kingsted v. Wright Cnty. Co-op. Co.*, 133 N.W. 399, 400 (Minn. 1911) (finding that a lease provision requiring the lessor to "keep the building in good repair during the life of this lease" "did not impose upon him an obligation to make improvements or betterments"); *New York v. United States*, 97 F. Supp. 808, 818-19 (Cl. Ct. 1951) (holding that "where the lease contract specifically requires the tenant to keep the premises in good repair the only obligation is to return the property in substantially the same condition as it was at the beginning of the tenancy, ordinary wear and tear excepted"); *Taylor v. Gunn*, 227 S.W.2d 52, 56 (Tenn. 1950) (holding that "[a] covenant to keep in repair imposes on the tenant an obligation merely to keep the premises in as good repair as they were when the agreement was made").

Razorbacks points to the Arkansas Supreme Court case *Sparkman v. Etter* to argue that Arkansas law differs from that cited above.  458 S.W.2d 129 (Ark. 1970).  According to Razorbacks, *Sparkman* implicitly held that whether a tenant violated a "good condition" clause in a lease does not depend on the leased property's condition at the beginning of the lease term. The Court disagrees.

In *Sparkman*, the court determined that a tenant was liable for the costs to repair the bathrooms and the tile floor of the leased property, despite the bathrooms and the tile floor not being there at the beginning of the lease because the tenant had installed them himself.  *Id.* at 133-34.  The court also remanded with instructions that the tenant should be directed to replace a party wall that the tenant had removed, the front of the building, and the electrical wiring in accordance with the plans and specifications submitted by the tenant's architect.  *Id.* at 132-35. The landlord and contractor did not remember the property's condition at the beginning of the lease term.  *Id.* at 132.

The tenant in *Sparkman* had entered into two separate lease agreements with two different landlords, each of whom owned half of the leased property.  *Id.* at 130.  Each lease contained a "good condition" clause and provisions dealing directly with improvements made by the tenant.  *Id.*  The first lease's improvement clause authorized the tenant to remodel the front of the building and remove the party wall, provided that it was "done in a good and workmanlike manner" and was restored to its "present condition" at the end of the lease term.  *Id.*  The second lease's improvements clause provided that "alterations and changes, structural or otherwise, . . . shall be considered as improvements and become a part of the real estate.  Tenant agrees that all alterations and changes made by it will be erected or made in a first-class, workmanlike manner."  *Id.*

In this Court's view, despite the lack of knowledge by the landlord and contractor as to the property's condition at the beginning of the lease, the *Sparkman* court had evidence of the property's prior condition at the relevant times.  The dispute in *Sparkman* centered on the condition of improvements—the bathrooms and tile floor—that had become part of the real property when built, pursuant to the second lease.  Because the second lease's improvements

clause required improvements to be made in a "first-class, workmanlike manner," the *Sparkman* court apparently assumed that the bathrooms and tile floor were in good condition at the time they were built and became part of the real estate, the relevant time under the lease. Based on this assumption, the court required the tenant to return the improvements to good condition. As for the party wall, front of the building, and electrical wiring, the tenant apparently admitted to altering them, and the plans and specifications of the tenant's architects apparently showed their condition before being altered. The court required the tenant to replace these items in accordance with the architect's plans and specifications. Based on this Court's reading of *Sparkman*, Arkansas law is not inconsistent with that cited above. Here, because the dispute centers on parts of the premises that existed at the time the 1989 lease was signed, not improvements that became part of the real estate when built, the beginning of the lease is the relevant time at which to consider the property's prior condition.

Razorbacks contends that the Court's interpretation of paragraph 15 renders it "moot" and "neutralizes" that portion of paragraph 24 that states "except as in this lease otherwise specifically provided." According to Razorbacks, paragraph 15 sets the maintenance obligation for certain parts of the premises, while paragraph 24, because of its exception language, operates as a catch-all provision setting the standard for portions of the premises not covered by paragraph 15 or other provisions of the lease. Only this interpretation, Razorbacks contends, gives viability and harmony to all provisions of the lease agreement.

The Court rejects Razorbacks's mootness and neutralization arguments. Paragraph 15 requires the tenant to *keep* and *maintain* certain parts of the premises, while paragraph 24 requires the tenant to *deliver* the entire premises. Thus, paragraph 15 is not moot because it imposes an additional obligation on the tenant that is not included in paragraph 24: to keep and

maintain the condition of parts of the premises, including the roof, throughout the lease period. On the other hand, paragraph 24 covers the condition of the entire property at the time it is delivered. Essentially, paragraph 15 is a "repair clause" covering certain parts of the premises during the lease, and paragraph 24 is a "surrender clause" covering all of the premises at the end of the lease. *See Whyzmuzis v. Plaza Shoe Store, Inc.*, 375 S.W.3d 928, 932 (Mo. Ct. App. 2012) ("A repair clause should be construed in light of any surrender clause."). Accordingly, pursuant to paragraph 24, GPI was obligated to *deliver* at the end of the lease the premises in as good order, repair, and condition as it was in at the beginning of the lease term. Conversely, GPI was obligated to *maintain* during the lease only "the roof, exterior walls, foundations and structural frame of the building and the complete exterior and interior of the leased premises, including all glass, and the parking lot and all landscaping on the leased premises" (Dkt. No. 8-1, at 7).

Further, the exception language in paragraph 24 is not neutralized. Instead of referring to the condition of the premises, the first clause of the exception language of paragraph 24 applies to parts of the premises that the tenant does not have to deliver at the end of the lease term. Specifically, paragraph 18 provides that the tenant "shall have the right to install in or place on the leased premises" certain fixtures and equipment and that such fixtures and equipment "shall at all times remain the property of Tenant . . . and may be removed at any time by Tenant" (*Id.* at 7-8). In contrast, paragraph 17 provides that the tenant "shall have the right to make such alterations, additions or improvements in or to the leased premises as it shall consider necessary or desirable . . . provided that all such work shall be done in good and workmanlike manner, that the structural integrity of any building shall not be impaired, and that no liens shall attach to the leased premises by reason thereof" and that "[u]pon termination of this lease, such alterations, additions or improvements shall become the property of the Landlord" (*Id.* at 7). Paragraph 18

falls within the exception language of paragraph 24 while paragraph 17 does not.   In fact, Razorbacks's interpretation that the exception language of paragraph 24 refers to the condition of the premises would neutralize it, as the plain language and case law cited above show that paragraph 15 requires the same condition as paragraph 24.   Only the Court's interpretation of the exception language of paragraph 24 harmonizes all parts of the lease when read together while following the plain language of the lease and Arkansas law.   *See Coleman*, 216 S.W.3d at 574; *Fryer*, 978 S.W.2d at 306.

In sum and based on the above, the Court determines that GPI was obligated to maintain certain parts of the premises and deliver the entire premises in as good condition as at the beginning of the lease term.

## 2.      Evidence Of The Condition At The Beginning Of The Lease Term

GPI argues that, because it was obligated to maintain certain parts of the premises and deliver the entire premises only in as good condition as at the beginning of the lease term, Razorbacks, who has the burden of proof, must provide evidence about the condition of the property at the beginning of the lease.   *See Short v. Little Rock Dodge, Inc.*, 759 S.W.2d 553, 554 (Ark. 1988) ("[W]hen a party cannot present proof on an essential element of her claim there is no remaining genuine issue of material fact, and the party moving for a summary judgment is entitled to judgment as a matter of law."); *see also Fortune Funding, LLC v. Ceridian Corp.*, 368 F.3d 985, 989 n.3, 990 (8th Cir. 2003) (affirming exclusion of evidence on the property's condition in 1997 because the "relevant inquiry at trial" was the condition in 1985 when the party's entered into the sale-leaseback transaction).

Razorbacks claims that it has presented evidence that the condition of the facility at the end of the lease was substantially worse than when the lease began.   First, Razorbacks contends

that the language of the lease itself shows that the property was in good condition at the beginning of the lease term.  Specifically, Razorbacks argues that the requirement in paragraph 15 that the tenant "maintain" and "keep" the premises in good condition, along with the plain meanings of "maintain" and "keep," indicate that the premises was in good condition at the beginning of the lease term.

Second, Razorbacks cites the deposition testimony of Bobby Bowen, who worked for GPI and its predecessors for over 25 years until he retired in 2011 (Dkt. No. 39-2, at 3).  Mr. Bowen testified that GPI had roof leakage problems for less than ten years, though there may have been "a couple minor leaks . . . past the ten year mark" (*Id.*).  Though unclear from this statement alone when in his 25-year tenure this ten-year span of leaks occurred, Mr. Bowen later testified that leaks requiring repairs occurred maybe four or five times per year in the past four to five years (*Id.* at 4-5).

Third, Razorbacks cites the report of defendant's expert Jeff Maxwell.  After inspecting the site, Mr. Maxwell concluded that the original roof remained on the building (Dkt. No. 32-7, at 1-2).  Although Mr. Maxwell stated that he did not "know how to determine whether or not the building was returned to the owner in the same condition as it was at the commencement of the lease," he went on to state that "[b]ased on the information [he] was given about the age of the building, [he could] assume that the roof was near the end of its expected life-cycle when [GPI] took occupancy, but would also assume that it was weather-tight at that point," and that it "no longer meets the weather-tight criteria" today (*Id.* at 4).

Based on this record evidence, construed in the light most favorable to the non-moving party Razorbacks, a reasonable juror could conclude that the roof was in worse condition at the end of the lease term than it was at the beginning.

### 3. Evidence That The Roof Wore Out Because Of GPI's Alleged Failure To Maintain

GPI, in its second supplemental brief, argues that summary judgment should be granted as to Razorbacks's failure to maintain theory because Razorbacks does not have "any evidence to support the theory that the roof wore out because of a failure to maintain" (Dkt. No. 72, at 2). According to GPI, Razorbacks's experts agree that the roof, as a "component part," has a lifespan and that, no matter how well maintained, it will wear out (*Id.*). Despite the fact that "it is entirely possible that the subject roof simply lived past its life span," GPI argues, "no one has made any determination of the age of the roof" (*Id.*). Razorbacks responds that "GPI's assertion that the roof was beyond its life span [sic] does not absolve it from liability as its obligation was to maintain the facility" and that "[t]he fact that the roof was allowed to regress to such a condition is evidence in and of itself that GPI . . . failed to meet its responsibility regarding replacements" (Dkt. No. 76, at 2). Razorbacks claims that "[i]f the roof was beyond its lifespan and needed to be replaced, it was GPI's obligation to do so" (*Id.*).

The Court agrees with Razorbacks. As determined above, paragraph 15 of the lease agreement obligated GPI to maintain certain parts of the premises, including the roof, in as good condition as at the beginning of the lease term. Paragraph 15 also provides that the landlord, Razorbacks, "shall have no obligation to make repairs *or replacements* during the term of this lease" and that the tenant, GPI, has "the sole responsibility for maintaining the leased premises in good condition as to repairs *and replacements*" (Dkt. No. 8-1, at 7 (emphasis added)). Experts for both GPI and Razorbacks appear to agree that, under the lease, if the roof needed to be replaced, it was GPI's obligation to do so (Dkt. Nos. 72-2, at 9, 76-1, at 20-21). The Court also notes that paragraph 15, unlike paragraph 24, does not contain a "normal wear and tear" exception, and the parties have cited no case law suggesting that such an exception should be

read into it.  Because Razorbacks has provided evidence sufficient to allow a reasonable juror to conclude that the roof was in worse condition at the end of the lease term than it was at the beginning, a reasonable juror could conclude that the roof was beyond its lifespan at the end of the lease term but not at the beginning.  If a jury does so find, GPI was obligated to replace the roof under paragraph 15.  For this reason and the reasons above, the Court denies GPI's motion for summary judgment as to Razorback's theory that GPI failed to maintain the premises.

**C.    The Theory That GPI Improperly Took Equipment And Fixtures Out Of The Building**

GPI moves for summary judgment as to Razorbacks's theory that GPI improperly took equipment and fixtures out of the building.  GPI argues that, to survive summary judgment, Razorbacks must have evidence of what was installed in the building, when, and by which entity.  Specifically, GPI contends that it is entitled to summary judgment as to its removal of the overhead cranes, fire extinguishers, a boiler, transformers, bug netting, gas heaters, air conditioners, security system, fire department access gate, auto-locking door systems, and overhead doors.  GPI's argument is based on paragraph 18 of the lease, which provides that:

> Tenant shall have the right to install in or place on the leased premises, such as fixtures, machines, tools or other equipment (including but not limited to trade fixtures, lighting fixtures, water coolers and air conditioning equipment) as it may choose.  Such fixtures, machines, tools or other equipment shall at all times remain the personal property of Tenant regardless of the manner or degree of attachment thereof to the premises, and may be removed at any time by Tenant, whether at the termination of this lease or otherwise; provided, however, that Tenant shall make reasonable restoration of the leased premises in the event that any substantial damage is done thereto in the removal of any such property.

(Dkt. No. 8-1, at 7).  Razorbacks agrees that GPI may remove fixtures that it, or a predecessor tenant in the time period covered by the controlling lease, installed on the premises, but claims to have evidence that neither GPI nor its predecessor tenants installed certain fixtures that GPI removed.

GPI removed overhead cranes and fire extinguishers.  In his affidavit, Mr. Bowen swears that the overhead cranes and fire extinguishers were installed by Great Plains Bag Corporation (Dkt. No. 23-10).  Great Plains Bag Corporation preceded Stone Container Corporation, which re-leased the property through the 1989 lease (Dkt. No. 39, at 12).

The Court determines that the 1989 lease is not controlling because the overhead cranes and fire extinguishers were installed before 1989 and because the 1989 lease does not establish that it is a renewal of a prior lease or provide any right for the tenant in existing fixtures and equipment.  However, in its supplemental brief, GPI provided the previous lease between Great Plains Bag Corporation, GPI's predecessor in interest, and Great Plains Realty Company, Razorbacks's predecessor in interest.  Paragraph 18 of the previous lease, like paragraph 18 of the 1989 lease, provides that fixtures and equipment installed by the tenant remain the personal property of the tenant "at all times" and "may be removed at any time by Tenant, whether at the termination of this lease or otherwise" (Dkt. No. 62-3, at 10).

The parties agree that the overhead cranes and fire extinguishers were installed by Great Plains Bag Corporation.  GPI argues that Great Plains Bag Corporation was its predecessor in interest and, thus, GPI was entitled to remove fixtures and equipment that Great Plains Bag Corporation installed under the previous lease.  Razorbacks appears to argue that only tenants directly under the 1989 lease are GPI's predecessors in interest (Dkt. No. 33, at 10-11).  To the extent that Razorbacks makes this argument, the Court disagrees.  It is undisputed that GPI is the successor in interest to Stone Container Corporation in regard to the leased interest, through a series of mergers and acquisitions.  Stone Container Corporation, also through a series of mergers and acquisitions, is the successor in interest to Great Plains Bag Corporation in regard to the leased interest.  Accordingly, pursuant to the previous lease, GPI retains the right to "remove

at any time . . . whether at the termination of the lease or otherwise" fixtures and equipment installed by Great Plains Bag Corporation.  The Court grants GPI's motion for partial summary judgment as to Razorbacks's theory that GPI improperly took the overhead cranes and fire extinguishers.

GPI also removed from the building a boiler—which the parties appear to agree GPI or its predecessors installed to replace a preexisting smaller boiler—and six to eight transformers.  Razorbacks points to Mr. Bowen's deposition testimony as evidence that the smaller boiler was not installed by GPI or its predecessors:

> Q.      Do you know if the boiler was in the building when you leased it?
>
> A.      We put the boiler in.
>
> Q.      Okay.  Did you replace a previous boiler?
>
> A.      Yes.  We had a smaller one, and we went with the next size up because the smaller one couldn't keep up.

(Dkt. No. 39-2, at 9).  Regarding the transformers, Mr. Bowen, who had been employed at the facility since 1976, testified that he does not recall the transformers ever being replaced (*Id.*).

Based on the evidence presented by Razorbacks, a reasonable juror could conclude that the smaller boiler and the transformers were not installed by GPI or its predecessors, meaning the Court must apply general Arkansas law regarding fixtures.  Arkansas law provides a three-part test to determine whether an item is a irremovable fixture: "(1) whether it is annexed to the realty; (2) whether it is appropriate and adapted to the use or purpose of that part of the realty to which it is connected; (3) whether the party making the annexation intended to make it permanent."  *Adamson v. Sims*, 151 S.W.3d 23, 26-27 (Ark. Ct. App. 2004) (citing *Pledger v. Halvorson*, 921 S.W.2d 576 (Ark. 1996)).  "The third factor—the intention of the party who made the annexation—is considered of primary importance."  *Id.*  The question of whether

particular property is an irremovable fixture is usually a mixed question of law and fact.  *See Corning Bank v. Bank of Rector*, 576 S.W.2d 949, 952 (Ark. 1979).

Here, based on the record before the Court viewed in the light most favorable to the non-moving party Razorbacks, a reasonable juror could conclude that the boiler and transformers were fixtures and that GPI was not entitled to remove them.  A reasonable juror could conclude that the boiler and transformers were annexed to the realty and used for the purpose of the part of the realty to which they were connected, and that the installers of the boiler and transformers intended they stay with the facility.  Therefore, the Court denies GPI's motion for partial summary judgment as to Razorback's theory that GPI improperly took the boiler and transformers.

Lastly, GPI contends that Razorbacks has provided no evidence as to the bug netting, gas heaters, air conditioners, security system, fire department access gate, and overhead doors.  Razorbacks, in its response to GPI's motion for partial summary judgment, does not address these items.  The Court grants GPI's motion for partial summary judgment to the extent that Razorbacks contends that GPI improperly took these items from the building.

### D.     Claim For Punitive Damages

"Punitive damages are to be a penalty for conduct that is malicious or done with the deliberate intent to injure another."  *E.g.*, *Edwards v. Stills*, 984 S.W.2d 366, 483 (Ark. 1998); *United Ins. Co. of Am. v. Murphy*, 961 S.W.2d 752, 757 (Ark. 1998).  "Malice" does not necessarily mean personal hate but "an intent and disposition to do a wrongful act greatly injurious to another."  *Chi., R.I. & P.R. Co. v. Whitten*, 119 S.W. 835, 837 (Ark. 1909).  To be entitled to an award of punitive damages, a plaintiff must show that the defendant knew or should have known that "its conduct would naturally or probably result in injury and that it

continued such conduct in reckless disregard of the circumstances from which malice may be inferred." *Carpenter v. Auto. Club Interinsurance Exch.*, 58 F.3d 1296, 1304 (8th Cir. 1995) (quoting *HCA Health Servs. v. Nat'l Bank of Commerce*, 745 S.W.2d 120, 125 n.1 (Ark. 1988)). "Negligence, however gross, will not support an award of punitive damages." *E.g.*, *Edwards*, 984 S.W.2d at 484; *J.B. Hunt Transp., Inc. v. Doss*, 899 S.W.2d 464, 469 (Ark. 1995). "The question of whether evidence in the record is sufficient to support a finding of actual malice is a question of law." *Southall v. Little Rock Newspapers, Inc.*, 964 S.W.2d 187, 193 (Ark. 1998).

Razorbacks argues that GPI acted with malice in declining to address the roof with knowledge that doing so would cause grater damage to the roof and roof structure, actively concealing a leak in the fire suppression system, and converting Razorbacks's property. Regarding GPI's alleged failure to address the roof, malice "may be inferred from a conscious indifference to attendant circumstances." *Olson v. Riddle*, 659 S.W.2d 759, 761 (Ark. 1983). Likewise, GPI's alleged intentional concealment of a defect, taken as true, could allow an inference of malice. In the context of conversion, punitive damages are appropriate where a plaintiff shows an "intentional exercise of control or dominion over the converted property for the purpose of violating the owner's right to the property, or for the purpose of causing damages." *Hudson v. Cook*, 105 S.W.3d 821, 829 (Ark. Ct. App. 2003). Taken as true, Razorbacks's allegations that GPI took the boiler and transformers and that GPI knew that the boiler and transformers as fixtures belonged to the owner of the facility could support an inference of malice. For these reasons, the Court denies GPI's motion for partial summary judgment as to Razorbacks's claim for punitive damages.

\* \* \*

In sum, the Court grants in part and denies in part GPI's motion for partial summary judgment.  Summary judgment is granted in favor of GPI to the extent that Razorbacks contends that GPI improperly took the overhead cranes, fire extinguishers, bug netting, gas heaters, air conditioners, security system, fire department access gate, and overhead doors from the building. Razorbacks's motion for partial summary judgment is denied.

IT IS SO ORDERED this the 7th day of March, 2014.


KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE